## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

HOLLY PETERSON-WOOD,

     Plaintiff,

                                  Case No. 2025-cv-

v.                                     Hon.

HARBOR HALL, INC.;
PETER BUCCI; and LAWRENCE ROCHON,

     Defendants.

_____

Sarah S. Prescott (P70510)
Joan Campau (P87538)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
*Attorneys for Plaintiff*
105 East Main Street
Northville, MI 48167
(248) 679-8711
*prescott@sppplaw.com*
*campau@sppplaw.com*

_____

### COMPLAINT AND JURY DEMAND

    HOLLY PETERSON-WOOD, by and through her attorneys, SALVATORE PRESCOTT

PORTER & PORTER, PLLC, submits this Complaint and states as follows:

### OVERVIEW

    Peter Bucci is a self-proclaimed sex addict, and a documented serial sex harasser. He

masturbated at work and bragged about it, talked about the women he wanted to his

subordinates, sexually touched multiple staff, had sex with addicts he was supposed to be

treating and with former addicts he was supervising, distributed film of his wife having sex, and

much more. His boss, Defendant Lawrence (Larry) Rochon offered no recourse; in fact, he

engaged in sexual harassment and ***promoted*** Bucci shortly after paying off one of his sex harassment victims. Rochon had been warned repeatedly about Bucci, but intentionally protected him. The two sexually harassed Plaintiff. On Bucci's part this included a hostile work environment and quid pro quo sexual demands. When Plaintiff resisted, she paid for it. As Bucci liked to say, job advancement for women at Harbor Hall "came with strings." When Plaintiff broke free enough to stand up to the criminal, fraudulent activity Bucci had introduced, he discredited her and Harbor Hall fired her.

## PARTIES AND JURISDICTION

1.    Plaintiff Holly Peterson-Wood is a resident of Emmet County, Michigan.

2.    Defendant Harbor Hall, Inc. is a business registered in Petoskey, Michigan, in Emmet County, Michigan.

3.    Defendant Peter Bucci is, upon information and belief, a resident of Emmet County, Michigan. Until recently, he served as Harbor Hall's CEO.

4.    He was terminated because of his sexual misconduct, albeit dressed up by the lawyers in this case to try to manage liability.

5.    Defendant Lawrence Rochon is, upon information and belief, a resident of Emmet County, Michigan. He is the President of the Board of Directors of Harbor Hall.

6.    The alleged violations forming the basis of this action occurred in Emmet County, Michigan, which is within the Western District of Michigan.

7.    This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

8.    Venue is appropriate under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).

9.      Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 18, 2025. Upon exhausting that remedy and receiving a Notice of Right to Sue, Plaintiff will amend this complaint to include causes of action under Title VII of the Civil Rights Act of 1964.

<u>**GENERAL ALLEGATIONS**</u>

10.      Harbor Hall is an addiction treatment facility.

11.      In or around February 2016, Plaintiff began working at Harbor Hall as an accountant.

12.      Plaintiff was good at her job and was promoted repeatedly, first to Finance Director and then to Chief Administrative Officer (CAO) in or around 2021.

13.      When Plaintiff became CAO, she led the organization with Defendant Peter Bucci, who was promoted to Executive Director at around the same time.

14.      Plaintiff's termination in October 2024 was the culmination of several factors including: a) *quid pro quo* sexual harassment by Defendant Bucci, b) years of hostile work environment sexual harassment perpetrated by Defendant Bucci (and knowingly tolerated by Defendants Rochon and Harbor Hall), c) retaliation for resisting Defendant Bucci's sexual advances, and d) exposing Harbor Hall's involvement in a fraud scheme.

15.      Since her unlawful termination, Defendant Bucci has defamed Plaintiff by spreading falsehoods about her departure from Harbor Hall.

***Defendants Harbor Hall and Rochon knew Defendant Bucci had a long and sordid history of sexual harassment***

16.      Bucci was hired into Harbor Hall as an addiction counselor or clinician.

17.      He had previously worked in Georgia, where, he told managers at Harbor Hall, he departed his employment after engaging in sexual misconduct.

18.    Defendant Rochon was aware of this fact during times relevant here.

19.    In the first few years they worked together, Plaintiff and Bucci developed a collegial working relationship.

20.    Over time, however, Bucci began to groom Plaintiff, socializing the concept that it was appropriate to talk about sex at work.

21.    Early on, he spoke of sexual exploits generally or vaguely.

22.    Eventually, he shared that his sexual background included sex with subordinates.

23.    In time, Bucci detailed his sexual history with his wife, including explaining that his wife knew of some of his past affairs.

24.    He told Plaintiff that he had started dating his wife in high school, and she was so naive that he did not need to worry about her divorcing him.

25.    In short, Bucci introduced sex and intimate discussions slowly and over time, to make Plaintiff less attuned to his over-sharing and the sexual nature of the dialogue.

26.    Slowly, however, he began to make sex an inescapable subject.

27.    He recounted past sexual encounters in great detail.

28.    He described his current sex life with his wife.

29.    He talked about his penis and told Plaintiff that he had a large penis.

30.    He talked about what kind of sex is most preferred.

31.    He sent Plaintiff pictures of himself naked.

32.    He also informed Plaintiff that he was active on websites for individuals seeking anonymous sex. He explained that he often used the sites to meet up with people for sex while traveling.

33.    As Bucci insinuated himself with Plaintiff, he also began acting in emotionally abusive ways, often focused on his power and influence not only over her, but over Harbor Hall as a whole and the town she lived in.

34.    As part of this abusive cycle, Bucci put Plaintiff down, disparaging her lower-middle-class background.

35.    Bucci emphasized to Plaintiff that he is very rich and has powerful familial connections.

36.    Indeed, Bucci's parents featured prominently in his employment at Harbor Hall.

37.    In the small Northern Michigan community in which Harbor Hall is located, Steven and Suzanne Bucci are minor celebrities due to their wealth and social connections.[1]

38.    Defendant Bucci used this to his advantage, regularly reminding anyone who would listen about his father's political prominence and his mother's great wealth, *i.e.*, to imply that he was prominent, powerful, connected, and wealthy himself.

39.    Bucci's desire for control and prestige was no secret. When Bucci still served as Harbor Hall's clinical director, he bragged, "This [Harbor Hall] is going to be my kingdom someday."

40.    Bucci made staff, including Plaintiff, plainly aware that he was close with Rochon, the president of the Harbor Hall Board, and that their "boys club" and mutual affection was impenetrable and protected him.

41.    For example, Bucci told Plaintiff she was not needed to discuss operations, and that "the boys" would handle it.

---

[1] Mr. Steven Bucci was a liaison for a former Secretary of Defense.

42.    Rochon reinforced this with his own inappropriate sexual commentary. For instance, when Plaintiff did attend Board meetings, Rochon made blatantly sexual comments openly and without any opposition.

43.    Bucci explicitly bragged that he had Plaintiff securely "under his thumb" by virtue of his control over her work environment and his relationship with Rochon.

44.    Plaintiff felt economically insecure (she was also going through a divorce) and that Bucci could control her success at work. She worked hard to keep him happy, to manage his very large ego, and to make him feel that she supported him in order to get along.

45.    Over time, Bucci wove together his favorite themes of his power and his sexual fantasies.

46.    For example, he openly fantasized to Plaintiff about having "controlling" sex, and talked about a particular, then-current sexual partner whom he referred to as "his" possession or "pet," whom he liked to choke during sex. Bucci described in detail having anal sex with this woman and physically controlling her by the hair.

47.    Bucci told Plaintiff that someone needed to "dominate" *her* sexually as well.

48.    Eventually, Bucci sent Plaintiff videos in which he was having sex with his wife.

49.    On information and belief, these were taken without his wife's knowledge or consent.

50.    Bucci clearly enjoyed the transgressive and outrageous things he knew he could say without recourse at work. For example, he seemed to enjoy bragging that he "jacked off" in the bathroom at work routinely.

51.    He also told Plaintiff that he "jerked off" at his desk.

52.    Staff confronted Bucci about stains on his chair that appeared to be semen.

6

53.     Bucci also spoke openly of masturbating himself in his truck on the way to work, or on the way home, explaining that because the truck was large, no one could see.

54.     Bucci's conduct became more and more extreme, as he seemed to relish seeing what he could get away with and got a thrill from his humiliation of and control over Plaintiff.

55.     For example, over time he began to expose himself to Plaintiff when she came into his office to discuss business: he would unzip his pants, pull out his penis, and stroke himself.

56.     This happened on multiple occasions.

57.     Bucci knew that Plaintiff was struggling in her marriage and in an emotionally difficult place.

58.     Taking advantage of this vulnerability, Bucci began touching Plaintiff as well, making repeated comments about her breasts, her "ass" and her legs; and eventually proposing sex with him.

59.     During 2020, Bucci came to the hotel room where Plaintiff was quarantining from COVID-19. He propositioned her for sex.

60.     Plaintiff did not feel she could keep her job and resist his advances, and she unwillingly followed his stern directions: to get on all fours, at which point Bucci penetrated her from behind, ejaculated inside of her a few minutes later, and left without saying a word.

61.     Thereafter, on a weekly basis and sometimes daily, Bucci came to work and told Plaintiff that her "boobs" looked good, that a certain bra made her "boobs" look smaller, that her skirt made her "ass" look good, or that her heels made her calves look good.

62.     Bucci also told Plaintiff that she had a "great ass" and that he would like to have anal sex with her.

63.    The parties engaged in a sexual relationship.

***Plaintiff rejects Bucci***

64.    Things might have continued this way, except that Plaintiff met a person with whom she could have a healthy and appropriate relationship.

65.    Emboldened by the support she was receiving outside of work, Plaintiff told Bucci to stop the sexual talk and told him *no* and not to say sexual things *about* or *to* her time and again after meeting her now-husband.

66.    Bucci would not take "no" for an answer.

67.    Bucci's comments made Plaintiff so uncomfortable that she avoided him when possible and amped up the supportive ego-management to try to compensate and placate him non-sexually.

68.    Despite the clear requests to stop, Bucci continued to make explicit sexual comments to Plaintiff and to proposition her.

69.    Among other things, he asked Plaintiff whether she and her husband wanted him to be the third in a threesome. Plaintiff plainly and strongly rebuffed this advance, but Bucci repeated it multiple times thereafter.

70.    Bucci also continued to speak to Plaintiff about her own body, how she looked, and how he appreciated various body parts.

71.    Bucci also continued to fantasize about having sex with or the sex lives of his subordinates, including Jerika Kiley, Aleena Hellebuyck, and Kelly Rekowski.

72.    Regarding Ms. Kiley, Bucci told Plaintiff that she seemed very innocent and sweet, but that he would "love to get her naked and see just how sweet she is."

8

73.     He talked about "fucking" Ms. Kiley and pulling her hair, and about "controlling" her and making her his.

74.     When Ms. Kiley got pregnant in 2020, Bucci talked in the workplace about how he craved her pregnant body.

75.     Bucci also told another staff member that he wanted to "choke" Ms. Kiley - that he fantasized about her "begging" and wanting to "see fear in her eyes."

76.     Ms. Kiley noticed Bucci lecherously watching her and shared with Plaintiff that she did everything she could to avoid being alone with him.

77.     At one point Bucci told Ms. Kiley not to wear leopard print because he would not be able to control himself if she did.

78.     And his licentiousness did not stop with words: he also physically sexually exploited subordinates he knew to be vulnerable.

79.     Upon information and belief, Bucci repeatedly summoned one of Harbor Hall's medical care managers - a single mother who desperately needed the paycheck - to his office to perform oral sex on him.

80.     When the woman's supervisor learned of this and objected, Bucci fired them both.

81.     In response to Bucci's sexual comments regarding his subordinates, Plaintiff observed to him that he clearly had not learned anything from his past experiences and that it was deeply inappropriate to talk about sex in the workplace.

82.     Her admonition made no difference.

83.     According to multiple witnesses, Bucci talked openly about his "sex addiction," including to his patients.

84.    His patient lectures also included endorsing sexual relationships between 40-year-old men and 14-year-old girls.

85.    Perhaps as disgusting as anything Bucci did, he admittedly had sex with addict patients of Harbor Hall or their partners. At one point, he was allowing one to stay in a room on his property.

86.    To be clear, some of these patients were diverted to Harbor Hall for drug abuse rather than serving time in jail. They needed to complete the Harbor Hall program (and secure Bucci's assent to their doing so) in order to remain free, parent their children, support their parents, see their spouses, and of course to recover from addiction.

87.    Bucci further covered for and protected a treater at Harbor Hall who displayed child pornography in the workplace. Harbor Hall's top management knew about multiple such reports and did not file any report with police.

88.    In general, because the nature of Bucci's behavior is so widely known, he has a reputation in the community as a predator towards females in recovery.

89.    Moreover, his conduct was so pervasive that new, young female staffers would be taken aside by Harbor Hall veterans and warned to "watch out" for Bucci's advances.

***Harbor Hall pays off Bucci's first reported harassment victim and promotes Bucci***

90.    In October or early November 2022, Bucci propositioned a subordinate for sex at a conference.

91.    When she rejected him, he followed her to her hotel room, and did so again. She refused.

92.    This conduct was reported through proper channels at Harbor Hall, with no redress.

93.    Bucci commented to this subordinate about her "ass" frequently, and she continued to report it.

94.    When this subordinate asked about rising in the ranks at Harbor Hall, Bucci stated that she had to "earn" a promotion, using a tone and facial expression that indicated he wanted sex.

95.    When she asked what this would entail, to clarify, he told her to "use your pretty head to think." She dropped it and avoided the conversation.

96.    Later, when her direct supervisor dangled the possibility of a promotion to this same subordinate, Bucci intervened and told this subordinate, "You know strings are attached with that promotion."

97.    This individual retained counsel and put Harbor Hall's management on notice in April 2023, citing the *quid pro quo* harassment and hostile work environment then prevailing.

98.    Harbor Hall paid her to settle the matter quietly out of court, with full Board knowledge.

99.    Defendant Rochon told Plaintiff that he believed that Bucci had been inappropriate (there was some truth to the "notice" he had been put on), but he also minimized it, saying that Bucci's "personal life" was his own business and that Harbor Hall just needed to "move past" his behavior.

100.    Rochon received reports of Bucci's misconduct from multiple staff, but discouraged reporting and protected Bucci.

101.    As examples, he told staff to "stay in their lanes," chastened individuals for escalating "gossip," and told people not to "tattle."

102.    These sentiments and Mr. Rochon's protection of Bucci were known to Plaintiff and caused her to fear that reporting Bucci would lead to nothing productive and would likely lead to retaliation against *her*.

103.    Rochon meanwhile *comforted* Bucci, for example telling him to just "ride it out" with regard to the evidence of harassing staff, and Bucci made sure Plaintiff was well aware that this was Rochon's position.

***Defendant Bucci finally understands that he no longer has sexual control over Plaintiff and responds by beginning a campaign of retaliation against her***

104.    Shortly after Harbor Hall paid for the staffer's release on sex harassment claims, in or around June of 2023, Bucci and Plaintiff attended a Human Resources conference in Las Vegas.

105.    Plaintiff and Bucci were peers at the time, serving as Chief Administrative Officer and Executive Director, respectively.

106.    Plaintiff did not want to be alone with Bucci at a conference and asked her fiancé (now husband) to travel with her.

107.    One afternoon during the conference, Plaintiff and her husband met Bucci at the hotel pool.

108.    When he got even a momentary opportunity, Bucci continued the sexual come-ons to Plaintiff, including telling Plaintiff that she looked great in her bikini and asking whether she and her husband wanted Bucci to join them in their hotel room.

109.    Plaintiff rejected him yet again and told Bucci not to comment on her bathing suit, adding that they did not want him to join them in their hotel room.

110.    She then reminded him that they were ***at an HR conference*** and that he needed to stop asking for a threesome with Plaintiff and her husband.

111.    Plaintiff brought her husband to dinners each night during the conference to avoid being alone with Bucci.

112.    At one dinner, Bucci made relentless comments about the breasts of a woman at the next table.

113.    The woman apparently heard him and came over to their table to ask what the issue was.

114.    Plaintiff's husband apologized to the woman for Bucci's conduct.

115.    Plaintiff married her husband on July 29, 2023.

116.    Bucci observed and understood that Plaintiff was devoted to her husband and was not going to tolerate Bucci's unwanted sexual comments after the Las Vegas trip. She had rejected him sexually many, many, many times and he no longer believed he "owned" her.

117.    Bucci reacted to Plaintiff's repeated rejections with anger, and told her that he would go forward as the sole leader of Harbor Hall after the trip to Las Vegas.

118.    Plaintiff knew and understood that Bucci was angry with her for rejecting him and reactive to her whenever she pulled back even slightly from engaging with him. She continued to try to contribute as positively as she could and to manage his ego and volatility to remain employed.

***Plaintiff informs the Board of Directors that Bucci has embroiled Harbor Hall in a fraud scheme; instead of investigating, the Board demotes Plaintiff***

119.    Around the same time, during July and August of 2023, Plaintiff learned that Bucci had hired a third-party biller that was defrauding the United States and State of Michigan, known as Ethos Labs.

120.    As she dug into Ethos's conduct, she learned that it submitted false claims for payment to CMS for urine drug testing (UDT) on Harbor Hall patients.

121. Among other things, Ethos submitted claims for testing done pursuant to blanket UDT orders that were the same for all patients from a particular provider's practice, without obtaining any individualized determination of medical necessity by the ordering provider. Indeed, the provider did not even bother to see the Harbor Hall patients—at all.

122.  Moreover, most or all of these tests were not medically required, but rather they were court-ordered as part of addiction treatment.

123. CMS cannot be billed for anything that is not medically necessary.

124. A related scheme involved repeated testing and COVID-19 testing without regard to medical need.

125. Plaintiff identified an individual physician whose signature was falsely put on these tests in order to provide the veneer of medical need, but the treater had no encounters with the patients and made no individual determination of medical need. It is not entirely clear whether the physician even knew his signature was being used.

126. Not only had this occurred at Harbor Hall, but Plaintiff identified identical activity by the same lab by identifying a public investigation by the U.S. Department of Justice (DOJ). The DOJ would go on to settle with Ethos Labs and recover millions of dollars in false claims.

127. When Ethos Labs employees fled to a new company, Vibra, Bucci retained Vibra, which in turn carried forward the Ethos Labs fraud as set forth above. The actors moved to a new lab, and continued the fraud including at Harbor Hall.

128. By the time Plaintiff identified this was happening, Mr. Bucci was well into his plan to eject her from Harbor Hall.

129. He could not readily admit his mis-step and let anyone know she had identified it.

130.    As a result, he would hear no objection to these schemes, and made clear to Plaintiff that nothing she could say would be escalated.

131.    In August 2023, Plaintiff therefore escalated the issue to Harbor Hall's Board herself, understanding that these issues were potentially criminal in nature and that *she* could be individually liable if she looked the other way.

132.    She had done extensive research on the subject and brought documentation with her outlining the illegality of the scheme.

133.    But instead of investigating the matter or even taking time to review the evidence, Bucci assured the mostly-volunteer part-time Board that everything was "fine."

134.    Specifically, he told the Board that he had called the Michigan Supreme Court and that someone there had assured him then and there on the call that Harbor Hall's practices were acceptable.

135.    This line worked: the Board believed him.

136.    Thereafter, Defendant Rochon instructed Plaintiff, the Chief Administrative Officer of the entity, not to be concerned with what Bucci was doing—that she must not "tattle" on him.

137.    These comments reinforced to Plaintiff that no matter how much evidence she brought forward to the Board about Bucci's misconduct, it would not matter and that reporting him for harassment was out of the question.

138.    Nevertheless, Plaintiff and another employee reported the fraud to the Office of the Investigator General in 2023, understanding this to be their legal duty.

*Bucci convinces "the boys" on the Board to oust Plaintiff*

139.    About four months after paying a victim of his sexual harassment, and in the days after Plaintiff informed the Board that Bucci had involved Harbor Hall in a fraud scheme, Rochon championed Bucci's *promotion*, and Harbor Hall made him CEO.

140.    This was the culmination of Bucci's angry statement to Plaintiff after many rejections in Las Vegas that there was not room for both of them at the top of Harbor Hall.

141.    Remarkably, Defendants placed Human Resources under Bucci despite notice of his sexual harassment, further making a mockery of any effective opportunity to escalate Bucci's harassment.

142.    Meanwhile, Plaintiff was demoted to become his subordinate.

143.    Bucci's announcement that leadership was no longer divided between himself and Plaintiff took on the visual of a victory lap; Mr. Bucci literally pounded his chest.

144.    Defendant's Board sent a letter to Harbor Hall staff, announcing the leadership change and that Bucci was now in charge of HR. The letter noted that Bucci had the ***full support*** of the Board in his new role.

145.    This reiterated to all staff that Bucci was untouchable and the Board would entertain no complaints against him: after all, a sex harassment complaint was followed by Harbor Hall *elevating* Bucci and endowing him with responsibility for any future sex harassment complaints, after all.

146.    To many staffers, Bucci appeared invincible because the Board would not listen to complaints against him, and raising concerns about his behavior meant putting one's job on the line. Staff, including Plaintiff and others, were constantly made to feel that Bucci's access to his parents' money and social connections gave him a *carte blanche* at Harbor Hall.

147.    Upon information and belief, Bucci's earlier supervisors and the Board were unwilling to discipline him for fear of alienating key donors.

148.    Instead, Bucci, Rochon, and the Board systematically and progressively sidelined Plaintiff because of her protected conduct described herein.

149.    Bucci began meeting with the Board alone after she tried to out the Ethos scheme, informing Plaintiff that he and "the boys" would handle things.

150.    Plaintiff was not only excluded from general leadership meetings, but she was not even permitted to attend those regarding *her own department*.

151.    Plaintiff never received feedback or support from the Board.

152.    Bucci and the Board also revoked Plaintiff's remote work arrangement - a particularly cruel form of retaliation given that Plaintiff's husband worked out of state. This was yet another incidence of Bucci exercising control: if Plaintiff was no longer willing to submit to his sexual demands, nor would he permit her to have a relationship with anyone else.

153.    By the end of summer 2024, Bucci and Rochon (the "boys" who liked to meet without Plaintiff) had convinced the Board of Directors that Plaintiff was unnecessary.

154.    In this way, Bucci punished Plaintiff for firmly and clearly rejecting him at the HR conference in Las Vegas and for exposing his involvement in a fraud scheme.

***Leadership was fully aware of Bucci's sexual harassment when he was promoted to CEO***

155.    Prior to Bucci's promotion to CEO in the summer of 2023, Program Director Dan Thompson informed Defendant Larry Rochon, the Board President, of Bucci's history of sexual impropriety in the workplace.

156.     Among other things Mr. Thompson shared with Rochon what Bucci had done during his Georgia employment and that Bucci had had sex in his Harbor Hall office with the girlfriend of one of his patients during a "family session."

157.     Upon information and belief, Rochon was also aware of the allegations that Bucci had repeatedly demanded oral sex from one of Harbor Hall's female medical care managers - and then fired both her and her manager when the manager objected.

158.     A former supervisor of Bucci's, likewise, met with Defendant Rochon and another Board member to share a concern about Bucci's unethical behavior. The Board members undertook no investigation and made no record of this, on information and belief.

159.     A now-former Harbor Hall employee specifically requested an interview with Defendant Rochon to report concerns with Bucci. Again, no record was made of the discussion on information and belief.

160.     And upon information and belief, Rochon was present for at least some of the comments Bucci made about hiring particular candidates because he found them physically attractive. As detailed above: Rochon had personal knowledge of many of Bucci's exploits, but opted to shield him.

***The Board's decision to elevate a known sexual harasser was consistent with their years-long tolerance of a sexually hostile work environment***

161.     That the Board knowingly elevated a serial sexual harasser is not entirely surprising because for years Bucci and Rochon had cultivated an environment among Harbor Hall's leadership that condoned just such behavior.

162.     For instance: at the very first Board meeting Plaintiff attended, Defendant Rochon made a "joke" about Viagra and then, to deliver the punchline, stuck out his leg to describe the size of an erection.

163.    Board members would regularly engage in this type of "locker room talk" during their meetings.

164.    One Saturday, the president of the Harbor Hall Foundation was giving his girlfriend a tour of Harbor Hall's facility and was startled to find Plaintiff there working. He told her that it was a good thing they saw her when they did, because they were "about to have sex on the conference room table."

165.    The same man came on to Plaintiff, commenting on her attractive tan lines after driving past her home and watching her mow her lawn in shorts.

166.    The clinical provider, who was repeatedly reported for having child pornography on Harbor Hall computers, shared details about his sexual exploits during Directors' meetings at which managers were present, with no recourse.

167.    At one such occasion he recounted a time when he was having sex with a woman and one of her breast implants popped.

168.    When one young staffer received vulgar comments, Harbor Hall's male leadership offered no guidance or help, but simply asked her *what did she expect as an attractive young woman*?

169.    A clinician reported sexual come-ons by patients to Bucci, who responded that he "didn't want to hear about these things."

170.    Under these circumstances, it is unsurprising that Bucci and the Board wanted Plaintiff *out*. Unwilling to comply with Bucci's sexual demands and having raised concerns about the legality of their operations, Plaintiff had become a liability when they terminated her.

***Since Plaintiff's unlawful termination, Bucci has defamed Plaintiff in their small community***

171.    Not satisfied with ruining her career, and sexually abusing her, Bucci has now engaged in a campaign to ruin Plaintiff's reputation as well.

172.    Upon information and belief, he has communicated to at least one physician in the community that Plaintiff was terminated due to a $300,000 accounting error.

173.    This is patently false and has harmed Plaintiff's reputation and economic prospects as she struggles to find new employment after her unlawful termination.

## COUNT I
## ELLIOTT-LARSEN CIVIL RIGHTS ACT
## SEX DISCRIMINATION - HOSTILE WORK ENVIRONMENT

174.    Plaintiff hereby incorporates all preceding paragraphs.

175.    Plaintiff was an employee of Defendants by and within the meaning of the Elliott-Larsen Civil Rights Act.

176.    Plaintiff is female.

177.    Plaintiff was subjected to sexual conduct and communications by Defendants Bucci and Rochon on the basis of her sex.

178.    The sexual conduct and communications were unwanted.

179.    The sexual conduct and communications were intended to and did in fact substantially interfere with Plaintiff's employment, creating a hostile and offensive work environment.

180.    Defendant Harbor Hall, Inc. and Defendant Rochon were on actual and/or imputed notice that Defendant Bucci engaged in hostile work environment sexual harassment at times relevant, and before Plaintiff suffered various incidents of harassment described above.

181.    Defendants' actions were intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

182.    Defendants' conduct constitutes hostile work environment sex discrimination in violation of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*

183.    As a direct and proximate result of those actions, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

184.    As a direct and proximate result of Defendants' discrimination, Plaintiff has sustained damages including lost wages and benefits, mental anguish, physical and emotional distress, humiliation, and embarrassment.

## COUNT II
## ELLIOTT-LARSEN CIVIL RIGHTS ACT
## SEX DISCRIMINATION - *QUID PRO QUO*

185.    Plaintiff hereby incorporates all preceding paragraphs.

186.    During her employment, Plaintiff was subjected by Defendant Bucci to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors.

187.    Plaintiff's submission to Defendant Bucci's unwelcome advances was an expressed or implied condition for receiving job benefits; Plaintiff's refusal to submit to Bucci's sexual demands resulted in tangible job detriment, including being sidelined and terminated.

188.    Defendants' actions were intentional, with deliberate disregard for the rights and sensibilities of Plaintiff.

189.    Defendant Bucci's conduct constitutes *quid pro quo* sex discrimination in violation of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

190.    As a direct and proximate result of Defendants' discrimination, Plaintiff has sustained damages including lost wages and benefits, mental anguish, physical and emotional distress, humiliation, and embarrassment.

## COUNT III
## ELLIOTT-LARSEN CIVIL RIGHTS ACT
## RETALIATION

191.    Plaintiff hereby incorporates all preceding paragraphs.

192.    Plaintiff engaged in protected activity under M.C.L. § 37.2701(a) when she opposed Bucci's sexual harassment and rejected his sexual conduct and commentary.

193.    Defendants Harbor Hall, Inc., Bucci, and Rochon knew about Plaintiff's protected activity.

194.    Defendants took adverse action against Plaintiff, including removing job responsibilities, interfering with her, spreading misinformation and falsehoods about her work performance, and terminating her, because of her protected activity.

195.    Defendants' retaliation against Plaintiff was intentional and/or was with reckless indifference to Plaintiff's rights.

196.    As a direct and proximate result of Defendants' retaliation, Plaintiff has sustained damages, including lost wages and benefits, mental anguish, physical and emotional distress, humiliation, and embarrassment.

## COUNT IV
## FALSE CLAIMS ACT - 31 U.S.C. § 3730(h)
## RETALIATION

197.    Plaintiff hereby incorporates all preceding paragraphs.

198.    Defendants employed Plaintiff within the meaning of the anti-retaliation provision of the Federal False Claims Act.

199.    Plaintiff engaged in activity protected under the Act, including by investigating, opposing, and reporting a suspected fraudulent billing scheme.

200.    Defendants Harbor Hall, Inc., Rochon, and Bucci knew of this protected activity.

201.    Defendants retaliated against Plaintiff including by removing job responsibilities, interfering with her, spreading misinformation and falsehoods about her work performance, and terminating her, because of her protected activity.

202.    Defendants' retaliation against Plaintiff because of her protected conduct violated 31 U.S.C. § 3730(h).

203.    As a direct and proximate result of Defendants' retaliation, Plaintiff has sustained damages, including lost wages and benefits, mental anguish, physical and emotional distress, humiliation, and embarrassment.

**COUNT V**
**RETALIATION IN VIOLATION OF MICHIGAN PUBLIC POLICY**

204.    Plaintiff hereby incorporates all previous paragraphs.

205.    During the course of her employment at Harbor Hall, Plaintiff refused to violate the law, refused to acquiesce and participate in violations of the law, and opposed Defendants' unlawful policies and practices.

206.    Defendants' retaliation against Plaintiff was motivated by Plaintiff's refusal to violate the law or acquiesce in violations of law and for her vocal opposition to Defendants' unlawful policies and practices.

207.    Defendants' retaliation against Plaintiff violated clearly established public policy of the State of Michigan that an employer may not retaliate against an employee where the reason for the retaliation was the employee's failure or refusal to violate a law or rules and regulations of the State of Michigan or the United States during the course of employment.

208.    As a direct and proximate result of Defendants' retaliation, Plaintiff has sustained damages, including lost wages and benefits, mental anguish, physical and emotional distress, humiliation, and embarrassment.

**COUNT VI**
**MEDICAID FALSE CLAIM ACT - M.C.L. § 400.610c**
**RETALIATION**

209.    Plaintiff hereby incorporates all preceding paragraphs.

210.    Defendants are employers within the meaning of M.C.L. § 400.601 *et seq.*, the Medicaid False Claim Act.

211.    Plaintiff had a right pursuant to M.C.L. § 400.610c to be free from retaliation because of her participation in an investigation into activity prohibited by the Medicaid False Claim Act.

212.    Defendants were aware that Plaintiff had investigated activity described above that was prohibited by the Medicaid False Claim Act and its Michigan and federal statutory counterparts.

213.    Defendants retaliated against Plaintiff because of her participation in an investigation into activities prohibited by the Medicaid False Claim Act and its statutory counterparts, up to and including terminating her.

214.    Defendants' actions were intentional and with disregard for Plaintiff's rights and sensibilities.

215.    As a direct and proximate result of Defendants' retaliation, Plaintiff has sustained damages, including lost wages and benefits, mental anguish, physical and emotional distress, humiliation, and embarrassment.

## COUNT VII
### DEFAMATION
### As to Defendant Bucci Only

216.    Plaintiff hereby incorporates all preceding paragraphs.

217.    Plaintiff is a private individual.

218.    Upon information and belief, Defendant Bucci falsely communicated to a physician in Northern Michigan within the past year that Plaintiff was terminated due to a $300,000 accounting error.

219.    The statement was not privileged or was not privileged in any sense that evades liability for defamation.

220.    The publication of the defamatory statement was at least negligent.

221.    Publication of the statement caused and continues to cause Plaintiff actual harm.

222.    Plaintiff sought retraction in a letter dated March 5, 2025.

223.    As a direct and proximate result of Defendant Bucci's retaliation, Plaintiff has sustained damages, including attorney fees to be itemized, mental anguish, physical and emotional distress, humiliation, loss of reputation, and embarrassment.

### **RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants as follows:

a.  economic and non-economic damages;

b.  judgment for lost wages and benefits;

c.  punitive and exemplary damages;

d.  interest, costs, and attorney fees; and

e.  all other legal and equitable relief determined by the Court to be appropriate.

Respectfully submitted,
SALVATORE PRESCOTT PORTER &
PORTER, PLLC

Dated: April 18, 2025

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Joan Campau (P87538)
*Attorneys for Plaintiff*
105 East Main Street
Northville, MI 48167
(248) 679-8711
*prescott@sppplaw.com*
*campau@sppplaw.com*

## **DEMAND FOR JURY TRIAL**

NOW COMES Plaintiff, HOLLY PETERSON-WOOD, by and through her attorneys,

SALVATORE PRESCOTT PORTER & PORTER, PLLC, and hereby demands a jury trial in the

above-captioned matter.

Dated: April 18, 2025                    /s/ Sarah S. Prescott
                                         Sarah S. Prescott (P70510)
                                         Joan Campau (P87538)
                                         SALVATORE PRESCOTT
                                         PORTER & PORTER, PLLC
                                         *Attorney for Plaintiff*
                                         105 East Main Street
                                         Northville, MI 48167
                                         (248) 679-8711
                                         *prescott@sppplaw.com*
                                         *campau@sppplaw.com*